James S. COLEMAN, Appellant,

v.

UNITED STATES of America,
Appellee.

No. 19662.

United States Court of Appeals
District of Columbia Circuit.

Argued Feb. 17, 1966.

Decided July 14, 1966.

Petition for Rehearing En Banc
Denied Nov. 14, 1966.

Statement on Denial of Rehearing En
Banc Filed Nov. 29, 1966.

Certiorari Denied Feb. 27, 1967.

See 87 S.Ct. 979.

Mr. Joseph Forer, Washington, D. C.
(appointed by this court), for appellant.

Mr. Kirby W. Patterson, Atty., De-
partment of Justice, with whom Messrs.
David G. Bress, U. S. Atty., Frank Q.
Nebeker and Joel D. Blackwell, Asst. U.
S. Attys., were on the brief for appellee.
Mr. Charles A. Mays, Asst. U. S. Atty.,
also entered an appearance for appellee.

Before DANAHER, McGOWAN and LEV-
ENTHAL, Circuit Judges.

PER CURIAM:

This appeal is from a jury conviction
for rape and simple assault. It presents
no issue as to whether the rape occurred
under the circumstances of time and
place alleged, but only of whether the
verdict against appellant (who inter-
posed an alibi defense) can stand as
against the claim that it rested upon an
inadequate *quantum* of proof, or that
certain testimony was received under
conditions constituting prejudicial error.
This latter had to do with the Govern-
ment's impeachment of two of its own
witnesses pursuant to a claim of sur-
prise, as provided in 14 D.C.Code § 102
(Supp.V, 1966). We have concluded to
affirm; and we confine our detailed dis-
cussion to the impeachment matter be-

cause of the importance of wise administration of the applicable statute.

■ Our resolution of the weight of the evidence issue has, of course, been made without reference to the substance of any of the matters which were disclosed in the course of the impeachment. The Government's case consisted principally of (1) undisputed evidence that the complaining witness had been attacked and raped while walking down R Street, N. W., after having gotten off a bus at the corner of 14th and R in the course of coming home from work; (2) testimony by one Beaner that he was standing on the street corner with appellant and other young men when a woman wearing a coat of the color of that worn by the complaining witness appeared, appellant explained "Look at that woman," appellant and another set off after her, and Beaner shortly saw a "female" down the street surrounded by two "fellows"; and (3) evidence of a benzedrine test for the presence of blood on appellant, which test appellant agreed to take and which turned out positive, and in respect of which appellant responded negatively to a police inquiry as to whether there was any reason why there should have been blood on him.[1] Because the complaining witness was understandably unable to identify appellant directly, the Government's case was far from open and shut, especially in view of the obviously equivocal and faithless performance of the witnesses who were best situated to know what happened. But, even with these handicaps, we conclude that the issue of guilt could have been committed to the determination of a jury.

Two of the witnesses placed on the stand by the Government were among those named by Beaner as having been in the group on the corner; and the impeachment issue arises with respect to their testimony. One of such witnesses, Hosley, testified on direct examination that he did not know appellant and that he did not see appellant in the group. This had the effect of contradicting Beaner's testimony; and the prosecutor invoked the statute. The court concluded that there had been surprise, and permitted the prosecutor to examine Hosley as a hostile witness.[2] That examination was largely comprised of confronting Hosley with a prior statement signed by him, in which Hosley described being on the corner with appellant and how appellant had grabbed one of the other boys and said "Let's get her" when the woman appeared.

The second such witness, Flournoy, gave the prosecutor similar difficulties. Flournoy got as far on direct as admit-

[1]. Appellant urges that evidence of the test should not have been admitted, but we think there was no error in this regard on this record. See Schmerber v. State of California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). Nor do we think that reversal by reason of the admission of appellant's negative answer to the inquiry about the blood is constitutionally compelled, even if it be assumed, without being decided, that the warning was in some way deficient. See Johnson & Cassidy v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

[2]. The trial court conducted a hearing outside the presence of the jury when the claim of surprise was made. In that hearing Hosley testified with respect to the statement, and failed to support it in many respects. It is argued that it was error for the court to permit the statement to be used thereafter for impeachment in the presence of the jury, since the prosecutor could no longer be surprised by the weakening of his witness. But this overlooks the fact that Hosley had already—and in the jury's presence —contradicted Beaner. This is not, then, a case where the prosecutor knows even before the trial starts that his witnesses may be backing away from the testimony they will supposedly give, and may not reasonably be expected to respond differently under the influence of the oath and the courtroom atmosphere. This knowledge may attain a degree of certainty which would make it wholly reprehensible for the prosecutor to put a witness on for no purpose other than to try to get his prior inconsistent statement before the jury. The statutory requirement of a finding of surprise protects against such a case. Here, however, it is not claimed that the prosecutor was not genuinely surprised by Hosley's testimony in his initial direct examination before the jury.

ting that he was on the corner with Beaner and Hosley, but the Government could not get him to say flatly that appellant was there also, a reticence which again had the effect of contradicting Beaner's testimony. After another successful appeal to the statute, the witness was confronted with a signed prior statement. This said that appellant was present on the corner; that, on the appearance of "a light skin woman walking west to 15th Street on R," appellant had said to Flournoy "Come on, Man, look going down the street"; and that appellant and Flournoy pursued the woman and appellant attacked her.

It is urged upon us that it was reversible error for the trial court to permit the prosecutor to read both these statements in their entirety to the jury in the course of his use of them for impeachment. It is further argued that it was plain error for the trial court not to have cautioned the jury at the time it permitted impeachment that the resulting evidence was to be considered by the jury only in relation to credibility, especially since the prosecutor in his closing argument is also said to have fatally infected the record with references to the matters contained in the statements as if they were evidence bearing upon guilt or innocence. The trial court did charge the jury fully and properly in this regard at the end of the case, and there was no defense request that it do so earlier.

■ These contentions are strikingly parallel to those made to this court in Wheeler v. United States, 93 U.S.App. D.C. 159, 211 F.2d 19 (1953), cert. denied, 347 U.S. 1019, 74 S.Ct. 876, 98 L. Ed. 1140 (1954). They were all rejected in that case as necessitating reversal, although one judge dissented because of the comments made by the prosecutor in his jury argument and also doubted that the trial court should have permitted the reading of all of the witness's prior statement because it was prejudicially replete with the sordid details of a sexual attack by an adult on a small child. With respect to this latter point, the statements here involved are not of that character.

In any event, the majority in *Wheeler* thought that, since impeachment to some extent was proper, this issue lay within the traditional discretion of the trial judge to admit as much of the impeaching statement as is "essential to appraise the contradiction uttered from the witness stand." As in *Wheeler*, we cannot say that, applying this standard, there was a clear abuse of discretion in the record before us which makes a new trial inescapable.

■ In the same way, we see no reason to treat differently than did *Wheeler* the unchallenged comments in the closing argument, and the failure *sua sponte* to immediately caution as to the limited purpose for which the statements were being received. There is, as we have remarked before, an anomalous aspect to finding abuse in a discretion which has never been invoked; and we are far from persuaded that a failure to reverse for these reasons raises, any more than it did in *Wheeler,* the spectre of the conviction of an innocent person.

Thus we leave this conviction undisturbed. This record serves to remind us, however, of the difficulties inherent in achieving the legislative purpose, clearly stated in Section 102, of limiting the effect of impeaching statements to the credibility issue. See Byrd v. United States, 119 U.S.App.D.C. 360, 342 F.2d 939 (1965). In *Wheeler* we did say that a limiting caution at the time of impeachment, as well as in the final charge, "would certainly have been desirable." The passage of time since *Wheeler* has not altered that view; and this case is ample proof of the wisdom of our precatory expression in *Wheeler*.

The statute which embodies the impeaching privilege says nothing about cautionary instructions at any time. But we have said that a failure to give any instruction at all, even though never requested, vitiates the privilege accorded under the statute and may require reversal. Bartley v. United States, 115 U.S. App.D.C. 316, 319 F.2d 717 (1963). We see no reason why the effort to effectuate the spirit of the statute should not

invariably include a cautionary instruction at the time the statute is successfully invoked. See *Bartley, supra* at 318, 319 F.2d at 719. No difficulties of administration are involved. The trial judge must pause in any event long enough to make a determination of surprise, and that can easily be coupled with a warning to the jury that what they are about to hear has been accorded by Congress a status unlike that of other evidence brought out by the Government.[3] Such a course will not only further the legislative interest, but it will also eliminate a potent source of judicial waste in the form of retrials which might otherwise be unnecessary.

■ From this day forward, therefore, we read the statute as contemplating a ruling by the trial court which comprehends, in addition to a finding of surprise, an immediate representation to the jury as to the purpose for which the impeaching statements are being permitted to come in. Any other course is unnecessarily pregnant with dangers to the cause of justice as well as to economy in the employment of our already strained judicial resources; and both these interests are too important to be left to the alertness of defense counsel when there is an easy and obvious way to safeguard them at all events. The prospective operation we give this new approach

is, we think, consistent with the interests of justice. Compare Johnson and Cassidy v. New Jersey, Note 1, *supra*. But it is those same interests which will be significantly advanced by our new interpretation and, in trials held hereafter, it is not to be the less rigorously observed because we have seen fit to make it prospective.

The judgment appealed from is

Affirmed.

## STATEMENT OF CHIEF JUDGE BAZELON WHY HE BELIEVES THE PETITION FOR REHEARING EN BANC SHOULD BE GRANTED

BAZELON, Chief Judge (statement on denial of rehearing *en banc*):

I vote for rehearing *en banc*. In this case the Court determined that a new rule was required because "any other course is unnecessarily pregnant with dangers to the cause of justice." Despite this reason, the Court refused to apply the rule to Coleman, who had urged it on direct appeal. This refusal, I think, raises questions of sufficient importance to warrant rehearing *en banc*.

J. SKELLY WRIGHT, Circuit Judge, would grant petition for rehearing en banc.

---

3. The desirability of implanting this thought in the minds of the jury at this juncture is emphasized by the fact that the charging of the jury by the judge comes after the closing arguments. There is always the possibility that the prosecutor, by accident if not by design, will be imprecise in his characterizations of the impeaching statements. Unless there has been a warning at the time the statements come in, the jury will have no intimation that it should treat the statements differently from other evidence. To be told this by the court for the first time after the prosecutor's argument may, as a practical matter, be too late. Even in the absence of comment by the prosecutor, in a trial of any length several days may elapse between the impeachment and the final charge. During this interval, a jury may erroneously reflect upon the impeachment testimony as if it were direct evidence. Jurors are not supposed to crystallize their views of the case until they withdraw to deliberate, but they cannot be supposed to be listening to testimony in an intellectual vacuum. Having the jury aware of the true status of the impeaching statement throughout this period avoids this possible prejudice. Of course, a final instruction is always important as a reminder of the original caution.