**Gregory LUCAS a/k/a Tyrone Gregory Lucas, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 80–677.**

District of Columbia Court of Appeals.

Argued Sept. 2, 1981.

Decided Oct. 23, 1981.

Noel F. Danto, Silver Spring, Md., appointed by this court, for appellant.

Sylvia Royce, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry, and Wayne P. Williams, Asst. U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before NEBEKER, PRYOR and BELSON, Associate Judges.

NEBEKER, Associate Judge:

Appellant was indicted for first-degree felony murder while armed, D.C. Code 1973, §§ 22–2401, –3202, attempted robbery while armed, *id.*, –2902, –3202, and carrying a pistol without a license, *id.* –3204. During the course of trial the prosecutor impeached a government rebuttal witness with a prior inconsistent statement made to the grand

---

jury.[1] Defense counsel did not request a cautionary instruction to the jury on the limited purpose for which it could consider the grand jury testimony, nor did the trial judge give the instruction sua sponte. Appellant was subsequently convicted of involuntary manslaughter while armed, attempted robbery and carrying a pistol without a license. Examining the record as a whole, we cannot say with fair assurance that the jury verdict was not substantially swayed by the failure of the trial court to give the instruction. It is impossible to conclude that substantial rights were not affected. Thus, the error was not harmless. We reverse.

## I

The government's evidence revealed that two men drove into the District of Columbia to purchase drugs in the Fourteenth Street area of Northwest. On Wallach Place, the driver pulled the car over to the curb. A number of young men approached the car on the passenger's side. The passenger attempted to purchase some "bam" (preludin) with $65 which he held up at the window. The driver testified that, at this point, he heard someone say, "Give me the money, man." When he looked to his right, he saw five to seven young men at the car on the passenger side, one of them pointing a gun at the passenger. Again someone said, "Give me the money, man." The driver then began to let the clutch out on the car, but before the car moved at all, the passenger was shot, almost directly between the eyes.

The government introduced a statement obtained from appellant while in the custody of Metropolitan Police.[2] Appellant gave two versions of the incident in this statement. In the first version, he admitted being present but denied active participation. In the second version, appellant admitted that he handed the "bam" to the men in the car, that they tried to pull away without paying for it, that he had a gun in his hand, and that it "went off" when the car moved away.

Appellant, testifying in his own defense, repudiated the truthfulness of the statement and asserted an alibi defense.[3] In rebuttal the government presented appellant's brother, Caesar Lucas. Caesar Lucas testified that he was present at the scene and had observed appellant approach the car from the driver's side. He further testified that appellant had moved away from the car and was walking toward him when the shot rang out.

Immediately after this answer by the witness, the prosecutor sought permission to approach the bench. The trial judge, however, directed him to continue. The prosecutor then proceeded to impeach Caesar Lucas' in-court account of the incident with testimony that Lucas had given before the grand jury. Defense counsel objected in the following manner:

COUNSEL: Your Honor, I object at this time, and ask that we approach the bench, urgently. He is trying to impeach his own witness.

THE COURT: I understand that. And there are circumstances that the Court believes are justified.

Overruled.

Caesar Lucas then admitted having told the grand jury the following: that he saw

---

1. That situation is expressly covered by statute. D.C. Code 1973, § 14–102, provides:

   When the court is satisfied that the party producing a witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to the party or to his attorney statements substantially variant from his sworn testimony about material facts in the cause.

2. Appellant also challenges the admissibility of the statement. The trial judge denied appellant's pretrial motion to suppress the statement as a product of juvenile fright or despair. We have reviewed the record and conclude that the trial court's ruling is not without substantial support in the record. Therefore, we find no error on this ground. In re W.B.W., D.C.App., 397 A.2d 143 (1979); Taylor v. United States, D.C.App., 380 A.2d 989, 992 (1977).

3. Anthony Lucas, a brother of appellant, corroborated substantial elements of the alibi.

his brother approach the passenger side of the car, that he heard a shot ring out, that he took a gun from his brother immediately thereafter, and that he later gave it to someone for safekeeping.[4] When asked by the prosecutor if he told the truth to the grand jury, Caesar Lucas answered that he had not told the truth.

The trial court did not immediately instruct the jury on the limited use to which it could consider Caesar Lucas' grand jury testimony, nor did counsel for appellant request such an instruction. The court, however, did give a limiting instruction after the prosecutor's closing argument and again in its final instruction to the jury.

## II

We are again confronted with the question whether the erroneous failure to give the immediate limiting instruction requires reversal. Two avenues are arguably available. The first and most simple is an automatic reversal without regard to whether the error affects substantial rights. The other approach is to examine the entire record under the familiar doctrine of *Kotteakos v. United States*, 328 U.S. 750, 756, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946), and determine the presence or absence of reversible error.

We hold that the second avenue of review is the one required. A reading of *Lofty v. United States*, D.C.App., 277 A.2d 99 (1971), and the two cases on which it primarily is based reflects that no effort was made to rule out the need to inquire whether the particular error was harmless.[5] The opinion in *Lofty* quotes from *Coleman v. United States*, 125 U.S.App.D.C. 246, 249, 371 F.2d 343, 346 (1966), to the effect that a prospec-

tive requirement was imposed that an immediate "representation" be given to the jury on the use of the impeaching statement. The prospective command was, of course stated in the context of affirming Coleman's conviction. It was also preceded by the not surprising observation that such error "may require reversal." *Coleman v. United States, supra* at 248, 371 F.2d at 345. Thus, the *Coleman* command is inescapably within the context of the harmless error rule.

So also is the holding in *United States v. McClain*, 142 U.S.App.D.C. 213, 440 F.2d 241 (1971), a second authority for the *Lofty* holding. To be sure, in *McClain* the divided division reversed the conviction on a finding of "plain error." *Id.* at 218, 440 F.2d at 246. That phrase is but a shorthand expression of the rule that a court of appeals will reverse for plain error affecting substantial rights. The federal decisions upon which *Lofty* drew were governed by 28 U.S.C. § 2111 which commands that the federal courts of appeal "shall give judgment . . . without regard to errors or defects which do not affect the substantial rights of the parties." *Cf.* Rule 52(a) of the Federal Rules of Criminal Procedure which commands the trial courts that "any error which does not affect substantial rights shall be disregarded."[6] It is thus inescapable that those decisions were rendered, as was *Lofty*, in the context of a statutory command that errors not affecting substantial rights must be disregarded. Any other construction of *Lofty* would violate our duty to apply the harmless error rule. We do not view *Johnson v. United States*, D.C.App., 387 A.2d 1084, 1087 n.5 (1978) (en

---

4. The gun was never produced at trial.

5. In *Lofty* the government impeached one of its crucial witnesses after successfully claiming surprise and alerting the trial judge to the need for an immediate limiting instruction. None was given. The jury, during deliberation, focused on the impeachment by asking for further instructions on the impeaching statement. This court held the "claim of error to be substantial." *Id.*

6. Where the court errs in failing to give a cautionary instruction, a motion for new trial would permit the trial judge to evaluate possible prejudice to the rights of the defendant and articulate on the record the reasons for denying or granting the motion. In the event the motion is denied and an appeal is taken, the role of this court in reviewing the record would be the traditional one of deciding whether the trial court erred in finding harmlessness. This court would not be forced to a de novo decision on the point.

banc), to hold to the contrary in its adherence to *Lofty*, for a statutory command cannot be ignored by the court. Moreover, this court has previously recognized the need to inquire whether this error has affected substantial rights. *See Towles v. United States*, D.C.App., 428 A.2d 836 (1981).

This court, like our federal counterparts under 28 U.S.C. § 2111, is required by statute to render judgment without regard to errors which do not affect the substantial rights of the parties. D.C. Code 1973, § 11–721(e). This statute is the progeny of § 2111, *supra*, and earlier similar federal provisions in *Kotteakos v. United States, supra*. Therefore, in all instances—whether an objection is made or not—we must evaluate the degree of error on a case by case basis. *Johnson v. United States, supra* 387 A.2d at 1088; *Dixon v. United States*, D.C. App., 287 A.2d 89, 98, *cert. denied*, 407 U.S. 926, 92 S.Ct. 2474 32 L.Ed.2d 813 (1972); *see also Watts v. United States*, D.C.App., 362 A.2d 706, 709 (1976) (en banc).

From the whole record before us, we cannot say with fair assurance that the jury verdict was not substantially swayed by the error. It is "impossible to conclude that substantial rights were not affected." *Kotteakos, supra*, 328 U.S. at 765, 66 S.Ct. at 1243. The possibility that the jury considered the impeaching grand jury testimony as substantive evidence created a likelihood of substantial prejudice to appellant. The grand jury testimony, if considered for the truth of its content not only rebutted appellant's alibi defense, but also supported the second version of appellant's statement to police which he had repudiated. Both the grand jury testimony of Caesar Lucas and the second version of appellant's statement emphasize that the gun went off accidentally. The reduced verdict of involuntary manslaughter is consistent with the possibility that the jury did consider the grand jury testimony substantively. Finally, in reviewing portions of the prosecutor's closing argument, we believe the only fair reading possible is that he affirmatively argued the substantive truth of Caesar Lucas' grand jury testimony.[7] Considering the likely prejudice to appellant, failure to give an immediate cautionary instruction violated appellant's substantial rights and jeopardized the fairness of his trial.

*Reversed.*

---

7. The prosecutor argued as follows:

And there is one last thing. Caesar Lucas. Caesar Lucas, whose body was here but his mind was somewhere else. Caesar Lucas testified before the grand jury that his brother was on the scene. Caesar Lucas told you that he said before the grand jury that he saw that Volkswagen, that he walked down to that Volkswagen, that he asked whether or not they wanted any bam. He told you that his brother, Gregory Lucas, who sells drugs—you know that from Cecil—Caesar, rather, and from Gregory himself, walked up to that Volkswagen.

He told Gregory, "Take care of these people."

Now, is it conceivable, ladies and gentlemen, that Caesar Lucas would lie? Is it conceivable that Caesar Lucas would have told the police he saw Gregory Lucas, his brother, shoot the passenger? Is it likely Caesar Lucas would have gone before the grand jury, under oath, and told a lie, told that his brother shot the passenger? Is that conceivable?

Is it conceivable that Detective Donnell would come up with two versions to this offense? If you are going to fabricate something; if you are going to change something, do something underhanded, then why two versions? The first was sufficient. Why the second?

I submit to you, ladies and gentlemen, there is no doubt but that Gregory Lucas is guilty of felony murder while armed, guilty of attempted robbery while armed, and guilty of carrying a pistol without a license.

These comments concluded the prosecutor's closing argument and immediately thereafter, the trial judge gave the following instruction to the jury:

Ladies and gentlemen, in the course of argument you heard counsel refer to the prior statements made at a grand jury by the witness, Caesar Lucas. You will bear in mind that these were used for the limited purpose of impeachment, and they are not substantive evidence.